## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| DANIEL BAUMAN, | ) | No. 11 B 32418 |
| | ) | |
| Debtor. | ) | Judge Goldgar |

## AMENDED MEMORANDUM OPINION[1]

This matter is before the court for ruling after an evidentiary hearing on the objection of BankFinancial, FSB ("BankFinancial") to the exemption that debtor Daniel Bauman ("Bauman") claimed in the assets of the Bauman Venture Corporation Pension Plan and Trust (the "Bauman Venture Plan"). Bauman claimed the exemption under section 12-1006(a) of the Illinois Code of Civil Procedure, which exempts a debtor's interest in assets held in a "retirement plan." *See* 735 ILCS 5/12-1006(a) (2010).

For the following reasons – constituting the court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 7052 and 9014(c), Fed. R. Bank. P. 7052, 9014(c) – Bauman's interest in the assets of the Bauman Venture Plan is not exempt. BankFinancial's objection will be sustained and the claim of exemption disallowed.

## I. Jurisdiction

The court has subject matter over this case pursuant to 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). An objection to a debtor's claim of exemption is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). *In re DeMarco*, 491 B.R.

---

[1]     The amended opinion corrects typographical errors and stylistic problems. There are no substantive changes.

236, 239 (Bankr. W.D. Tenn. 2013). The bankruptcy court is therefore empowered to enter a

final judgment. 28 U.S.C. § 157(b).

## II. Facts

The evidence at the hearing showed the following.[2] Bauman is 76 years old. (Tr. at

248). Before his retirement in 2010 (*id.* at 69), Bauman was an active entrepreneur with

considerable business acumen (*see id.* at 17-31). He owned a number of closely-held companies

that operated various types of businesses. (*Id.*).

## A. Bauman Mortgage and Bauman Venture

Bauman started one of his companies, Bauman Mortgage Corp. ("Bauman Mortgage") in

1974. (Tr. at 18). Bauman Mortgage was in the business of making loans to residential

"rehabbers" who could not qualify for loans from banks. (*Id.* at 18-19). Unlike its rehabber

clients, Bauman Mortgage could qualify for bank loans. (*Id.* at 19). Bauman Mortgage borrowed

from banks at particular interest rates and then lent the borrowed funds to the rehabbers at higher

rates, making money from the interest-rate spread. (*Id.*).

One of the banks from which Bauman Mortgage borrowed money was BankFinancial.

(*Id.*). Bauman is individually indebted to BankFinancial either as a co-debtor on BankFinancial

loans to Bauman Mortgage or as a guarantor of Bauman Mortgage's obligations. (*Id.* at 225; B.

Ex. 1 at 15). According to BankFinancial, Bauman's debt stands at $1,822,863.34. (*See* Claim

No. 3-2).

---

[2]    The trial transcript is cited as "Tr. at [page number]." Because the parties used
only BankFinancial's exhibits at the hearing, all exhibits are cited as "B. Ex. ___." The page
numbers are either the exhibit's own or are Bates stamp numbers.

When Bauman Mortgage was incorporated, Bauman and his wife Roberta owned all the shares. (Tr. at 21). After Roberta's death, Bauman became the sole shareholder. (*Id.* at 21, 217). Bauman himself operated Bauman Mortgage; he "did the deals," sometimes five or ten at a time. (*Id.* at 252). Throughout its existence, Bauman was Bauman Mortgage's only employee. (*See id.* at 21).

About six years after he started Bauman Mortgage, Bauman formed Bauman Venture Corp. ("Bauman Venture"). (*Id.* at 20). Bauman was Bauman Venture's sole shareholder. (*Id.* at 217, 232). The company was in the consulting business, rendering services to Bauman Mortgage and other Bauman companies. (Tr. at 20, 69, 98). Just as Bauman was the only employee of Bauman Mortgage, he was the only employee of Bauman Venture and the only consultant performing services. (*Id.* at 20-21, 70, 254-55). The nature of those services was not disclosed; Bauman Venture's accountant, David Gilfand ("Gilfand"), described them as Bauman Venture simply "putting in its two cents on occasion" for a fee. (*Id.* at 222).[3]

Bauman testified that he never received compensation from Bauman Venture in a form reportable on a Form W-2 – that is, wages, salaries, or tips. (*Id.* at 97, 256, 290). He did not know whether he received a Form 1099 showing other types of income. (*Id.* at 97). Bauman explained that he did not know because it was his practice simply to "take money out [of the company] as [he] . . . needed it." (*Id.*). At the end of the year, he said, he would tell Gilfand the amounts withdrawn, and "then . . . [Gilfand] would do whatever magic he does." (*Id.*).

In describing his "magic," Gilfand disagreed that Bauman "never" received a salary from

---

[3]    David Gilfand is a certified public accountant and an enrolled treasury agent. (Tr. at 185). About thirty years ago, Bauman retained Gilfand as his personal accountant and as accountant for his companies, including Bauman Mortgage and Bauman Venture. (*Id.* at 186-87). Gilfand provided those services until his semi-retirement two years ago. (*Id.* at 185).

Bauman Venture. (*Id.* at 210). Gilfand attributed Bauman's belief that he received no W-2

income to his "being a layman [who] . . . would [not] understand the word salary because

probably wages means something that was being paid to him on a weekly, monthly, or quarterly

basis." (*Id.* at 210). Gilfand explained that Bauman was the "chief cook and bottle washer" at

Bauman Venture (*id.* at 221), and as a small business owner he could "do whatever the heck he

want[ed]" (*id.* at 232). According to Gilfand, Bauman could keep money in the till as retained

earnings, take money out as a salary, or make a contribution to a pension plan at his discretion, in

part because there is no basis under the Internal Revenue Code ("IRC") to challenge the salary of

someone running a closely-held corporation. (*Id.* at 232-33).

     Rather than receive a salary at regular intervals, Gilfand asserted, Bauman took draws

throughout the year. (*Id.* at 194-95). At year-end, the draws were totaled and then "grossed-up"

to include withholding for state and federal taxes, social security, and similar obligations. (*Id.* at

195, 214-15). Gilfand would instruct Bauman to issue himself a check from Bauman Venture in

the grossed-up amount and endorse the check back to Bauman Venture to pay for the draws. (*Id.*

at 195). A W-2 was issued to Bauman reporting the grossed-up amount as salary. (*Id.* at 214-

15).

     But no W-2s were introduced into evidence, nor was there any other documentary

evidence that this year-end process actually occurred. Gilfand conceded that the process he

described took place in the "earlier years, . . . the late '70s, '80s." (*Id.* at 215). For his part,

Bauman remembered the year-end meetings but confessed he "never paid much attention" at

them "because I did what they told me to do anyhow." (*Id.* at 275). Bauman testified that he

never saw a W-2 and did not believe any were ever issued. (*Id.* at 290-91). Notwithstanding

Gilfand's testimony, then, the evidence, especially the absence of documentary evidence to the

contrary, showed that Bauman received no salary from Bauman Venture from 1987 to the present.[4/]

Bauman Venture never had annual revenues of more than $100,000, and in some years its revenues were less than $50,000. (*Id.* at 221-223). Its historical revenues paled in comparison with the revenues of Bauman Mortgage. (*Id.* at 221). Recent corporate tax returns of both entities reveal the extent of the disparity. (*See* B. Exs. 13, 14). In 2006, 2007, 2008, and 2009, Bauman Mortgage's income was $423,154, $344,577, $164,011, and $100,687, respectively. (B. Ex. 13 at 2003, 1986, 1967, 1947). Bauman Venture did not produce a tax return for 2006, but in 2007, 2008, and 2009, it earned $14,600, $5,000, and $0, respectively. (B. Ex. 14 at 1898, 1880, 1862). Bauman Venture reported no annual income in 2010 and 2012. (*Id.* at 1831, 1846).

## B. The Pension Plans

In the late 1970s, Bauman sought advice from Gilfand about establishing a retirement plan for Bauman Mortgage. (Tr. at 189, 191). Gilfand consulted with an actuarial firm concerning private pension plans with the goal of finding one that would be advantageous to both Bauman and Bauman Mortgage. (*Id.* at 189). With the actuary's assistance, Gilfand

---

[4/]    The tax returns and tax transcripts introduced into evidence bear this out. Bauman's individual tax transcript for 1987 shows no receipt of W-2 income. (Tr. at 96; B. Ex. 22 at 2172). A tax transcript for 1988 lists $13,800 of "W-2 or 1099 withholding" but does not identify the payor. (Tr. at 91; B. Ex. 22 at 2174). A 1989 tax transcript shows $75 of W-2 or 1099 withholding but does not identify the payor, and Bauman admitted he did not know if it was Bauman Venture. (Tr. at 93-94; B. Ex. 22 at 2176). Bauman's attorney stipulated that the tax transcripts for 1990 through 1996 show no W-2 income from Bauman Venture. (Tr. at 97). There are no tax transcripts or any other evidence showing receipt of W-2 income from 1997 to 2005. Bauman's individual tax return for 2006 shows that he received $6,000 in "wages, salaries, tips, etc.," but the $6,000 came from another of Bauman's companies. (Tr. at 83; B. Ex. 12 at 2145). Bauman's attorney stipulated that Bauman did not receive any compensation from Bauman Venture from 2006 through 2012. (Tr. at 84).

recommended a plan to Bauman that he accepted on Bauman Mortgage's behalf. (*Id.* at 189).
The actuary then prepared the plan for Gilfand and Bauman's review. (*Id.*).

In March 1979, Bauman Mortgage as employer-sponsor, and Bauman and his wife as
trustees, entered into the Bauman Mortgage Corp. Retirement Plan and Trust Agreement,
effective May 1, 1978 (the "Bauman Mortgage Plan").[5/] (B. Ex. 2 at 389-486, 494; Tr. at 44-45).
The original version of the Bauman Mortgage Plan was later amended and restated, but none of
the restatements or amendments are in the record.[6/] (Tr. at 132-133). As the only employee of
Bauman Mortgage, Bauman was the only participant in the Bauman Mortgage Plan. (*Id.* at 36;
B. Ex. 2 at 397).

In 1980, Bauman consulted Gilfand about having Bauman Venture adopt its own pension
plan. (Tr. at 189). Gilfand turned to the actuary who had prepared the Bauman Mortgage Plan.
(*Id.*). Bauman Venture as employer-sponsor adopted the Bauman Venture Plan. (Tr. at 32, 36;
*see* B. Ex. 3 at 33). As with the Bauman Mortgage Plan, Bauman and his wife were trustees of
the trust, and Bauman was the only participant. (Tr. at 32, 36). The original 1980 version of the

---

[5/]      The Bauman Mortgage Plan is one of many documents in BankFinancial Exhibit
2. Also included are letters and faxes from Gilfand to Bauman Mortgage, letters from the
Internal Revenue Service ("IRS"), copies of the Bauman Mortgage Plan's tax returns, and
actuarial reports. In its exhibit list, BankFinancial describes Exhibit 2 as "[d]ocuments related to
the [Bauman Mortgage Plan] formation, participants, disclosure statements, beneficiaries and
funding requirements." (Bankr. Dkt. No. 84). It appears the exhibit is a copy of a Bauman
Mortgage binder or file into which documents concerning the Bauman Mortgage Plan were
deposited. (*See e.g.*, B. Ex. 2 at 360, 489, 493, 497-99, 502).

[6/]      In its Proposed Findings of Fact and Conclusions of Law ("B. Proposed
Findings"), BankFinancial argues that the form of the Bauman Mortgage Plan did not comply
with the IRC, and a loan made to Bauman disqualified the Plan from favorable tax treatment.
(*See* B. Proposed Findings at 20). Because BankFinancial did not object to the exemption
Bauman claimed in the assets of the Bauman Mortgage Plan, the arguments need not be
addressed.

Plan is not in evidence, nor are any of the restatements or amendments from 1980 to 2003. The

sole pre-petition version of the Plan in evidence is an amended and restated Bauman Venture

Plan dated September 15, 2003 (B. Ex. 3 at 18-101), along with amendments to the 2003 version

from 2007, 2009, and 2011 (*id.* at 104-112).[2]

On March 22, 2012, Bauman Venture adopted a restated Bauman Venture Plan, effective

December 1, 2011. (*Id.* at 113-241). The 2011 version of the Bauman Venture Plan consists of

three documents that together make up the plan: (i) a "volume submitter" adoption agreement

(the "Adoption Agreement") (*id.* at 113-146); (ii) a "volume submitter" trust document (*id.* at

147-159); and (iii) a "volume submitter" plan (the "Volume Submitter Plan") (*id.* at 160-241).

No witness explained why a component of the 2011 Bauman Venture Plan is a "volume

submitter" plan. A "volume submitter plan" is a form retirement plan prepared and submitted to

the IRS by a firm that certifies it has at least thirty employer-clients reasonably expected to adopt

the form plan. Rev. Proc. 2011-49, 2011-44 I.R.B. 608 § 13. The IRS reviews the form plan to

decide whether it complies with the IRC. Once the IRS issues a "determination letter" approving

the form plan and the employer signs an adoption agreement selecting the optional provisions in

the form plan to be changed or added, the approved form plan, the adoption agreement, and the

trust document become the employer's plan. The employer can then rely on the determination

letter qualifying the form plan for preferred tax treatment, although that qualification can be lost

if the employer's plan is not operated in accordance with the IRC. *See generally* § 16.

Introduced without objection was a determination letter from the IRS dated January 31,

---

[2]    Exhibit 3 is a group exhibit containing an assortment of documents. Just as
Exhibit 2 appears to be a copy of the binder or file for the Bauman Mortgage Plan, Exhibit 3
appears to be a copy of the binder or file for the Bauman Venture Plan.

2011, concerning an unspecified volume submitter plan. (*See* B. Ex. 7 at 1829). The letter
approved only the volume submitter plan's form, not the operation of any particular employer's
plan. (*Id.*).

### C. The Operation of the Bauman Venture Plan

Operating a plan involves, among other things, calculating participant benefits,
monitoring employer contributions, making distributions to participants, maintaining plan
records, and preparing the plan's federal tax returns. (Tr. at 104-105). Both the 2003 and 2011
versions of the Bauman Venture Plan call for a plan administrator to operate the plan. (B. Ex. 3
at 83, 227). Under the Plan, the plan administrator is permitted to hire agents to perform his
duties. (*Id.* at 81, 227).

The plan administrator during the initial years of the Bauman Venture Plan was not
identified. Whoever it was, the first plan administrator hired as his agent the actuarial firm of
Emory & Associates ("Emory") to perform his duties. (Tr. at 111). In 1988, Pension
Administrators, Inc. ("Pension Administrators"), a company that manages in excess of 400
different pension plans, replaced Emory as administrator of the Bauman Venture Plan. (*Id.* at
103, 111). Terry Ronczkowski ("Ronczkowski"), owner of Pension Administrators, has been in
charge of the Plan's administration ever since. (*Id.* at 42, 102-104).

### 1. The Bauman Venture Plan's Federal Tax Returns

Through the years, Ronczkowski prepared the Bauman Venture Plan's annual federal
Form 5500EZ tax returns using information that Gilfand and Bauman supplied. (*Id.* at 104, 110,

171).[8/]  The returns were sent to Gilfand for review.  (*Id.* at 228).  It is unclear whether Bauman

reviewed the returns, and there were times when he did not sign them before they were filed.  On

the 2006 and 2007 returns, for example, Gilfand signed Bauman's name.  (Tr. at 54, 58).

## 2. Calculation of the Retirement Benefit

In addition to preparing the Bauman Venture Plan's tax returns, Ronczkowski calculated

Bauman's retirement benefit under the Plan.  Defined benefit plans like the Bauman Venture

Plan do not specify the exact monetary amount a participant will receive as a retirement benefit.

(*Id.* at 107-109).  The benefit is nonetheless called a "defined" benefit because the plan fixes the

mathematical formula used in the benefit's calculation.  (*Id.* at 108).  Plan sponsors can select

different formulas to define the benefit.  (*See, e.g.*, B. Ex. 3 at 125).  Typically, the formula is

based on a percentage of compensation the participant receives from his employer, the plan

sponsor.  (Tr. at 108, 115-116); *see also Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*,

241 F.3d 609, 610 (7th Cir. 2001) (explaining that a participant's benefit under a defined benefit

plan is "usually based primarily on his years of service and his wages").

The formula for Bauman's defined benefit under the 2003 version of the Bauman Venture

Plan appears in Article III (B. Ex. 3 at 48), although some components of the formula consist of

terms defined elsewhere (*id.*).  The formula provides that when Bauman reaches a "Normal

Retirement Age," and subject to certain conditions, he becomes entitled to a retirement benefit

---

[8/]      Every employer that maintains a pension plan, or the plan's administrator, must
file an annual return with the IRS stating "the qualification, financial condition, and operations of
the plan."  26 U.S.C. § 6058(a).  A single-participant plan like the Bauman Venture Plan files
Form 5500EZ, Annual Return of One-Participant (Owners and Their Spouses) Pension Benefit
Plan.  (Tr. at 53); *see also* I.R.S. Ann. 90-22, 1990-7 I.R.B. 28.

payable as an annuity for the remainder of his life in an amount equal to "21.65% of [his]

Average Annual Compensation." (*Id.* at 40-41, 48). "Normal Retirement Age" is defined as 60,

or 65 if Bauman fails to complete at least five "Years of Credited Service" before age 65. (*Id.* at

40, 43). A "Year of Credited Service" is a plan year during which Bauman completes at least

1,000 "Hours of Service" (*id.* at 43), meaning hours for which Bauman is paid or entitled to

payment (*id.* at 39). "Average Annual Compensation" is the "[c]ompensation . . . paid by

[Bauman Venture] to [Bauman] "during the highest 5 consecutive years within the last 10 years."

(*Id.* at 34). "Compensation" is defined as "wages, tips, and other compensation as reported on

Form W-2." (*Id.* at 35).

Put differently, the Plan's formula calculates Bauman's annual benefit by starting with

Bauman's annual W-2 income (salaries, wages, and tips) from Bauman Venture in the ten-year

period preceding the Normal Retirement Age. Bauman's Normal Retirement age is 65 because

he did not complete at least five Years of Credited Service in the last ten years (and he did not

complete them because he neither received nor demonstrated he was entitled to receive any W-2

income in those years). Bauman turned 65 in 2002, making the relevant ten-year period 1992 to

2002. His highest five consecutive years of W-2 income in that ten-year period is then averaged

and the average multiplied by .2165. The resulting figure is the benefit Bauman is entitled to

receive under the Plan each year after his retirement.[9]

The amendments to the 2003 version of the Bauman Venture Plan did not depart from the

Highest Five of the Last Ten Years Formula. (B. Ex. 3 at 104-112). In the Adoption Agreement

for the 2011 version of the Bauman Venture Plan, Bauman Venture again selected the Highest

---

[9]     For the sake of brevity, this formula will be termed the "Highest Five of the Last
Ten Years Formula."

Five of the Last Ten Years Formula. (*Id.* at 125, 127, 167). Bauman Venture's selection of the

Highest Five of the Last Ten Years Formula deviated from the formula in the Volume Submitter

Plan which is based on the highest three consecutive years of W-2 income during any years of

service (the "Highest of Any Three Years Formula"). (*Id.* at 167). But the Highest of Any Three

Years Formula in the Volume Submitter Plan is expressly subject to contrary terms in the

Adoption Agreement (*see id.*), and the 2011 Adoption Agreement opted for the Highest Five of

the Last Ten Years Formula.[10]

Under the Highest Five of the Last Ten Years Formula, Bauman is entitled to no benefits

from the Bauman Venture Plan. The calculation is straightforward: Bauman received no W-2

income from 1992 to 2002, the average of five years of zero income is zero, and 21.65% of a

zero average is also zero. (*See* Tr. at 154).

### 3. Contributions to and Distributions from the Bauman Venture Plan

#### a. Contributions

Under the Bauman Venture Plan, Bauman Venture is to make annual contributions to the

Plan "in such amounts as are necessary to maintain the Plan on a sound actuarial basis and to

---

[10]    Although his testimony on the point was vague, it appears Ronczkowski
mistakenly assumed that the Highest of Any Three Years Formula defined the benefit.
Ronczkowski testified that a three-year average of W-2 compensation is "typically" used to
determine the benefit payable at retirement (Tr. at 116), and when a defined benefit plan is
designed, the pension administrator calculates the benefit using the "highest three compensation
amount" (*id.* at 120, 149). "Once [those figures are] established," he said, "that three-year
average can apply all the way." (*Id.* at 149). When Ronczkowski's firm took over
administration of the Bauman Venture Plan, the accrued benefits had already been established
based on Bauman's past compensation, and Ronczkowski said the benefit calculation was simply
"kept" in the software. (*Id.* at 122).

meet minimum funding standards . . . ." (B. Ex. 3 at 47).[11] The Plan does not provide for

mandatory employee contributions and in fact expressly prohibits contributions from employees.

(*Id.*). Contributions to a pension plan on an employee's behalf are based on an estimate of the

amount of the employee's defined benefit (*id.* at 107-108), and the parties do not dispute that this

is true of contributions to the Bauman Venture Plan. Contributions cannot be greater than the

amount necessary to pay the defined benefit and in any event cannot exceed the limits in section

415(b)(1) of the IRC: $160,000 or 100% of the employee's highest compensation for three years.

26 U.S.C. § 415(b)(1).

The evidence did not show that Bauman Venture made regular annual contributions or

indeed any contributions. On the contrary, the evidence showed that the $1.2 million currently in

the Bauman Venture Plan consisted of three large contributions from sources other than Bauman

Venture – in two instances from Bauman himself. Those contributions were also excessive

because Bauman had no W-2 income and is entitled to no benefits.

### (1) The Austin Bond Sale Proceeds

The first contribution took place in the late 1980s when Bauman liquidated another

company he owned and deposited the proceeds into the Bauman Venture Plan. With a man

named Jerry Yavitz ("Yavitz"), Bauman co-owned Austin Bond & Mortgage Co., Inc. ("Austin

Bond"), an Illinois corporation that ran the same type of rehabber loan business as Bauman

Mortgage. (Tr. at 23-25). Some time before 1987, Austin Bond purchased large equity interests

---

[11]    Statements in this opinion that contributions are made to a pension *plan* or
distributions are made from a *plan* are shorthand for saying the contributions are made to or
distributions are made from the plan's *trust. See Ludden v. Comm'r*, 68 T.C. 826, 829 (1977)
(describing the trust as a "component part of an employee pension or profit sharing plan").

in three banks. (*Id.* at 25). In 1987, the company sold those interests to several other banks,

netting a "great deal of money." (*Id.* at 25-26, 95-96). Bauman and Yavitz later parted ways and

liquidated Austin Bond's assets. (*Id.* at 27). From the liquidation, Bauman received

approximately $750,000. (*Id.* at 96). Bauman then contributed "hundreds of thousands of

dollars" of the proceeds to the Bauman Venture Plan. (*Id.*).

To describe Bauman's testimony about the Austin Bond contribution as equivocal is an

understatement. Bauman testified variously that the deposit was made in cash from the

liquidation of Austin Bond (*id.* at 28-29, 96), that no proceeds from the liquidation were

deposited (*id.* at 63-64), that the deposit consisted of the bank stock itself (*id.* 29), that the

deposit did not consist of the bank stock (*id.* at 271), and that he could not remember (*id.* at 272).

There seems little doubt, however, that Bauman contributed a substantial sum from the Austin

Bond proceeds, perhaps as much as $750,000, to the Bauman Venture Plan in some form.

Whatever the contribution's form, Bauman could not recall whether he consulted Gilfand,

Ronczkowski, or any other professional before making it. (*Id.* at 64-65). Bauman did not read

the Bauman Venture Plan before he made the contribution; in fact, he admitted never having read

the Bauman Venture Plan or the Bauman Mortgage Plan and never consulting directly with

Ronczkowski. (*Id.* at 38-39, 42). "I have no knowledge of pension plans," he said. (*Id.* at 42).

Gilfand, too, did not remember Bauman consulting him about an Austin Bond contribution to the

Bauman Venture Plan, although, Gilfand said, Bauman would ordinarily have consulted him

before such a contribution. (*Id.* at 205-06, 227, 240-41).

**(2) The Bauman Mortgage Plan Assets**

The second contribution consisted of the assets of the Bauman Mortgage Plan. All the

-13-

assets of the Bauman Mortgage Plan, then valued at $282,148.83, were moved to the Bauman

Venture Plan no later than November 30, 2008.  (*Id.* at 51-57, 87, 198-99).  Bauman does not

deny that the assets were moved.  According to Gilfand, the plans were "merged" as a way of

reducing costs from duplicate amendments, duplicate filings, and so on, resulting in "big

savings" to Bauman.  (*Id.* at 198).

      The exact mechanics and precise date of the transfer are unknown, but the evidence at

least narrowed down the date.  A report that Gilfand prepared on the value of the Bauman

Mortgage Plan's assets states that as of April 30, 2008, the assets had a value of $282,539.  (Tr.

at 52, 144;  B. Ex. 8 at 2).  Bauman Venture Plan's 2007 Form 5500EZ for fiscal year ending

November 30, 2008, discloses a contribution to that Plan in the same amount, $282,539.  (Tr. at

144-45; B. Ex. 11 at 1528-1529).  Together, the Gilfand report and the Form 5500EZ show that

the Bauman Mortgage Plan assets must have been moved to the Bauman Venture Plan between

May 1, 2008 and November 30, 2008.

      Only after November 30, 2008, however, was the move formally documented.  In March

2009, at least four months after the fact, Gilfand (identifying himself as secretary of both Bauman

Mortgage and Bauman Venture, although it appears he was neither (*see* Tr. at 80, 291-92))

signed a board resolution for both corporations merging the Bauman Mortgage Plan into the

Bauman Venture Plan (B. Ex. 15 at 2170).  The resolution declared that the merger "shall be

completed by re-registering all assets held in the name of the [Bauman Mortgage Plan] into the

[Bauman Venture Plan]" and directed that the "proper officers . . . act as soon as possible to

accomplish all acts necessary to complete" the reregistering.  (*Id.*).  By then, however, the assets

had already been contributed to the Bauman Venture Plan.

-14-

### (3)  The Home Sale Proceeds

The third contribution happened in the months before Bauman's retirement.  In 2010, Bauman sold his residence in Northbrook, Illinois, and received net proceeds of approximately $411,000.  (Tr. at 66, 69).  Bauman spoke with Gilfand about contributing $183,000 of the net proceeds to the Bauman Venture Plan.  (*Id.* at 200).  Gilfand advised him to give the money to Bauman Venture as a capital contribution and then have Bauman Venture contribute the funds to the Bauman Venture Plan.  (*Id.*).  Bauman did so.  (*Id.* at 67-69, 77-78).

At the time, however, there was no reason for a capital contribution to Bauman Venture.  (*Id.* at 223).  Bauman Venture was not operating and had not operated for two years.  (*Id.* at 75-80, 252-253; B. Ex. 14 at 1831, 1846, 1862).  Bauman Venture was a consulting firm, and with "no funds available to do deals," there was "nothing to consult about."  (*Id.* at 69-70).  The only consultant, Bauman, was in the process of retiring.  (*Id.* at 69).

### b.  Distributions

Just as contributions to a pension plan depend on an estimate of the defined benefit, distributions are made in the amount of the defined benefit.  (*Id.* at 107-108).

Bauman received distributions of $40,000, $39,883, and $53,708 from the Bauman Venture Plan in 2008, 2009, and 2010, respectively.  (*Id.* at 86-88).  Each distribution was excessive because each was more than nothing, the benefit Bauman is entitled to receive.  Each distribution also differed in amount, although the distributions, defined by a fixed mathematical formula, should have been relatively similar, the only potential difference a standard percentage increase (typically 5%, according to Ronczkowski).  (*See id.* at 119, 125-26).  But Bauman's distributions did not follow a predictable path.  The distribution dropped in the second year and

then rose more than 5% in the third.  Ronczkowski could not explain the variances.  (*Id.* at 154-55).

### D.  The Bauman Bankruptcy

On August 8, 2011, about a year after he received the third distribution, Bauman filed this chapter 7 case.  Of the two Plans – the Bauman Mortgage Plan and the Bauman Venture Plan – only Bauman's interest in the Bauman Venture Plan had any value on the petition date.  (*See* B. Ex. 1 at 9).  On his Schedule B, Bauman disclosed that the Bauman Venture Plan holds $1,266,381 for his benefit.  (*Id.*).  The value of his interest of the Bauman Mortgage Plan was listed as $0.  (*Id.*).  On Schedule C, Bauman claimed as exempt under 735 ILCS 5/12-1006 (2010) his interests in the assets of both the Bauman Mortgage Plan and the Bauman Venture Plan.  (*Id.* at 12).

BankFinancial filed a timely objection to the Bauman Venture Plan exemption.  (Bankr. Dkt. No. 53).

### III.  Discussion

BankFinancial's objection to Bauman's claim of exemption will be sustained.  Bauman contends that his interest in the Bauman Venture Plan is exempt under two statutes protecting retirement funds.  One is an Illinois statute, section 12-1006(a) of the Illinois Code of Civil Procedure, 735 ILCS 5/12-1006(a) (2010).  The other is a federal statute, section 522(b)(3)(C) of the Bankruptcy Code, 11 U.S.C. § 522(b)(3)(C).  Neither exemption claim has merit.

### A.  Property of the Estate

Before addressing the exemptions, it is necessary to dispose of an argument Bauman

raised in his initial response to BankFinancial's objection. Bauman argued that because the

Bauman Venture Plan is qualified under the Employee Retirement Income Security Act of 1974,

29 U.S.C. § 1001 et seq. ("ERISA"), his interest in the Plan's assets is excluded from his

bankruptcy estate section under section 541(c)(2) of the Code, 11 U.S.C. § 541(c)(2). (Resp. at

4). If so, BankFinancial's objection to the exemption would be moot. *See Patterson v. Shumate*,

504 U.S. 753, 765-66 (1992) (stating that "in light of our conclusion that a debtor's interest in an

ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate

pursuant to § 541(c)(2), we need not reach respondent's alternative argument that his interest in

the Plan qualifies for exemption"); *In re Doyle*, 209 B.R. 897, 904 (Bankr. N.D. Ill. 1997).

      Bauman's argument runs up against two obstacles. First, he waived the argument.

Although Bauman raised the argument in his initial response, he presented no evidence at the

hearing to support it and failed to mention it at all in his post-hearing proposed findings of fact

and conclusions of law ("D. Proposed Findings"). "Arguments a party fails to raise in a timely

fashion, or raises but then fails to press responsibly throughout the litigation, are waived." *In re

Commercial Loan Corp.*, 316 B.R. 690, 699 (Bankr. N.D. Ill. 2004); *see, e.g., Goodpaster v. City

of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) (finding waived arguments raised in

pleadings but not argued again in the party's proposed findings and conclusions).

      Second, the argument is wrong on the merits. Bauman's interest in the Bauman Venture

Plan was not excluded from his bankruptcy estate but became part of the estate when he filed his

chapter 7 case. The filing of a bankruptcy petition creates an estate consisting of the debtor's

property. 11 U.S.C. § 541(a). The Code's definition of estate property is "broad," *United States

v. Whiting Pools, Inc.,* 462 U.S. 198, 205 (1983), encompassing "all legal or equitable interests of

the debtor in property," 11 U.S.C. § 541(a)(1). Accordingly, "every conceivable interest of the

debtor, future, nonpossessory, contingent, speculative, and derivative, is [property of the estate] within the reach of § 541." *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993).

Despite the definition's breadth, however, some property is excluded from a debtor's bankruptcy estate. *See* 11 U.S.C. §§ 541(b), (c). Section 541(c)(2) of the Code, the provision Bauman cited, provides that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable" in a bankruptcy case. 11 U.S.C. § 541(c)(2). Under this section, an enforceable transfer restriction will prevent a debtor's interest in a trust from becoming part of the estate. Bauman contended that the Bauman Venture Plan's anti-alienation provision preventing the transfer of his interest (*see* B. Ex. 3 at 97-98) could be enforced under ERISA and therefore qualified as a transfer restriction for purposes of section 541(c)(2).

Bauman was right about the general principle: retirement funds in an ERISA-qualified pension plan are excluded from a debtor's bankruptcy estate. *See Patterson*, 504 U.S. at 758. ERISA governs most private pension plans. *See In re Baker*, 114 F.3d 636, 638-39 (7th Cir. 1997); *In re Lowenschuss*, 171 F.3d 673, 680 (9th Cir. 1999). To protect plan participants from dissipation of their retirement funds, ERISA requires pension plans to include anti-alienation that participants can enforce. *See Watson v. Proctor (In re Watson)*, 214 B.R. 597, 606 (B.A.P. 9th Cir. 1977). This requirement and others in ERISA "were enacted 'to remedy abuses by employers who manage pension plan assets held in trust for workers in traditional employer-employee relationships.'" *Lowenschuss*, 17 F.3d at 680 (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985)).

The anti-alienation provision in an ERISA-qualified pension plan constitutes a restriction "enforceable under applicable nonbankrupcy law" for purposes of section 541(c)(2). *See*

-18-

*Patterson*, 504 U.S. 756-60; *see also In re Weinhoeft*, 275 F.3d 604, 605 (7th Cir. 2001) (noting

that "[a]pplicable nonbankruptcy law" means that "pension plans subject to the anti-alienation

rule of ERISA . . . are not part of an estate in bankruptcy"). Accordingly, if a debtor in

bankruptcy is a participant in an ERISA-qualified pension plan that includes an anti-alienation

provision participants can enforce, the debtor's interest in the assets of that plan is excluded from

his bankruptcy estate. *Patterson*, 504 U.S. at 760; *Baker*, 114 F.3d at 638.

But the general principle does not help Bauman because the Bauman Venture Plan is not

an ERISA-qualified plan. Not all pension plans are subject to ERISA. In particular, ERISA

expressly excludes from its coverage plans where the only participant is also the sole owner of

the plan's corporate sponsor. *Lowenschuss*, 171 F.3d at 680. ERISA does not cover these plans

because ERISA applies only to "employee benefit plans." 29 U.S.C. § 1003(a). At least one

plan participant must therefore be an "employee," *In re Watson*, 161 F.3d 593, 596 (9th Cir.

1998); *Meiszner v. Suburban Bank & Trust Co.*, 397 F. Supp. 2d 952, 954-55 (N.D. Ill. 2005),

and the regulations exclude from the definition of "employee" the sole owner of a corporation

sponsoring a single-participant plan, *see* 29 C.F.R. §§ 2510.3-3(b), (c)(1). *See Lowenschuss*, 171

F.3d at 680 (noting that "ERISA does not cover a pension plan of which the only beneficiary is

the sole owner of the company funding the plan"); *Meiszner*, 397 F. Supp. 2d at 956-57.

When a plan is not ERISA-qualified because the only plan participant is also the sole

owner of the corporate plan sponsor, the plan's anti-alienation provision is obviously not

enforceable under ERISA. The provision's enforceability does not change when the plan

participant and sole owner of the plan sponsor files a bankruptcy case; he is no more able as a

debtor in bankruptcy to enforce the plan's anti-alienation provision under ERISA than he was

before. *Lowenschuss*, 171 F.3d at 681 (noting that "[s]ection 541(c)(2) does not make

-19-

enforceable what is otherwise unenforceable"). Because he cannot enforce that provision, section 541(c)(2) does not apply, and his interest in the plan trust becomes property of his bankruptcy estate. *Id.*; *Watson*, 214 B.R. at 606.

Here, there is no dispute that Bauman is the sole participant in the pension plan of which his wholly-owned corporation, Bauman Venture, was the sponsor. The Bauman Venture Plan thus was not ERISA-qualified, Bauman could not enforce the anti-alienation provision in the plan under ERISA, and section 541(c)(2) did not prevent his interest in the plan from becoming property of his bankruptcy estate. Had there been no waiver, then, Bauman's section 541(c)(2) argument would have been rejected.

## B. The Exemptions

And so to the exemptions. Even when property is property of the estate, it may still be exempt, *Taylor v. Freeland & Kronz*, 503 U.S. 638, 642 (1992); 1 Robert E. Ginsberg & Robert D. Martin, *Ginsberg & Martin on Bankruptcy* § 6.01(A) at 6-3 (Susan V. Kelley, ed., 2013-1 Supp.), and retirement funds are no exception, *Lowenschuss*, 171 F.3d at 684 n.13. Bauman contends that the assets of the Bauman Venture Plan are exempt under either section 522(b)(3)(C) of the Code or section 12-1006(a) of the Illinois Code of Civil Procedure. But a debtor must claim exemptions on his Schedule C. Bauman did not claim the federal exemption on his Schedule C. And although Bauman did claim the Illinois exemption, the evidence showed that the Bauman Venture Plan does not satisfy the Illinois statute's requirements.

### 1. The Scheme for Claiming Exemptions

The scheme for claiming exemptions is set out in the Code and begins by giving most debtors a choice. Under section 522(b), an individual debtor "may exempt from property of the

-20-

estate the property listed in either paragraph (2) or, in the alternative, paragraph (3) of this subsection." 11 U.S.C. § 522(b)(1). In other words, most debtors are able to claim either the exemptions listed in section 522(b)(2) or the exemptions listed in section 522(b)(3).

The exemptions in section 522(b)(2) cover "property that is specified under subsection (d) [of section 522], unless the State law that is applicable to the debtor . . . does not so authorize." 11 U.S.C. § 522(b)(2). Section 522(d) specifies twelve kinds of property a debtor can exempt. 11 U.S.C. § 522(d). Because the exempt properties are spelled out in the Code itself, the section 522(b)(2) exemptions are often called the "federal" exemptions. *See, e.g., Stinnett v. Laplante (In re Stinnett)*, 465 F.3d 309, 314 n.3 (7th Cir. 2006); *In re Patterson*, 825 F.2d 1140, 1146 (7th Cir. 1987); *Shell v. Yoon*, 499 B.R. 610, 611 (N.D. Ind. 2013).

The exemptions in section 522(b)(3) cover

> (A) . . . any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition to the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition  . . . ;
>
> (B) any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law; and
>
> (C) retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986.

11 U.S.C. § 522(b)(3). Put succinctly, a debtor claiming exemptions under section 522(b)(3) can exempt (a) property covered by federal exemptions other than the exemptions in section 522(d), or property covered by state and local exemptions; (b) entireties or joint tenancy property; and (c) retirement funds in a tax-exempt fund or account.

-21-

Some debtors, however, are not permitted to choose between the exemptions in section

522(b)(2) and section 522(b)(3).  If the law of the state where the debtor resides prohibits the use

of the section 522(b)(2) exemptions, the debtor cannot claim them; he is limited to the

exemptions in section 522(b)(3).  *See* 11 U.S.C. § 522(b)(2).  Illinois is one of the states that has

"opted out" of allowing its residents to invoke them.  *See* 735 ILCS 5/12–1201 (2010).  Illinois

debtors are consequently limited to the exemptions in section 522(b)(3).  *In re Lantz*, 446 B.R.

850, 853 n.2 (Bankr. N.D. Ill. 2011) (noting that "Illinois has 'opted-out' of the federal

exemptions").[12]

## 2. The Section 522(b)(3)(C) Exemption

Bauman is not entitled to exempt the funds in the Bauman Venture Plan under the federal

retirement fund exemption.[13]  He is not entitled to the exemption primarily because he did not

---

[12]      Courts sometimes say that because of the "opt out,"an Illinois debtor can claim
only the Illinois state law exemptions.  *See, e.g., Lantz*, 446 B.R. at 853 n.2; *In re Driskell*, No.
08-40475, 2008 WL 4670995, at *1 n.3 (Bankr. S.D. Ill. Oct. 17, 2008) (stating that because
"Illinois has opted out . . . Illinois debtors must rely on the exemptions provided by Illinois law").
Not quite.  In addition to the exemptions permitted under state law, a debtor in an "opt out" state
can claim the other exemptions in section 522(b)(3).  When that debtor's property includes an
interest in retirement funds, he can claim any applicable state law exemption and also the
retirement fund exemption in section 522(b)(3)(C).  *See In re Orr*, No. 07-81177, 2008 WL
244168, at *1 (Bankr. C.D. Ill. Jan. 28, 2008) (holding that the federal retirement fund exemption
"is available independent of and in addition to the state law exemptions"); *In re Weilhammer*,
No. 09-15148-LT7, 2010 WL 3431465, at *2 (Bankr. S.D. Cal. Aug. 30, 2010) (stating that the
federal retirement fund exemption is an "additional retirement fund exemption for individuals in
states that opt out of the federal exemption scheme").

[13]      There are actually two federal retirement fund exemptions, one in section
522(b)(3)(C), the other in section 522(d)(12).  Because the exemption in section 522(d)(12) is
available only to a debtor who checks the box on Schedule C for the section 522(b)(2)
exemptions, section 522(d)(12) is not available to debtors in opt-out states and so was not
available to Bauman.  References in this opinion to "the federal retirement fund exemption"
mean the exemption in section 522(b)(3)(C).

claim it.

Exemption of property is not automatic.  When a bankruptcy case is filed, a debtor must

affirmatively claim the exemptions available to him.  A debtor claims exemptions on his

Schedule C.  *Schwab v. Reilly*, 560 U.S. 770, ___, 130 S. Ct. 2652, 2657 (2010).  To complete

Schedule C, the debtor must first indicate his choice between the section 522(b)(2) exemptions or

the section 522(b)(3) exemptions by checking the appropriate box at the top of the form.  *See*

Official Form No. 6C.  Because Illinois is an "opt-out" state, an Illinois debtor will always check

the section 522(b)(3) box; the exemptions in that section are the only ones he can claim.  *See In*

*re Templeton*, 146 B.R. 757, 761 (Bankr. N.D. Ill. 1992) (upholding a claim of exemption

"notwithstanding a probable typographical and proofreading reference on Schedule C to

subparagraph (b)(2)").

After checking either the section 522(b)(2) or section 522(b)(3) box, a debtor must then

claim the exemptions by completing the rest of Schedule C.  The body of Schedule C consists of

a four-column chart.  *See* Official Form No. 6C.  For each item of property claimed as exempt,

the debtor must (1) describe the property, (2) specify the law that provides the exemption, (3)

report the value of the claimed exemption, and (4) provide the current value of the property

without deducting exemptions.  *Id.*; *see* 4 *Collier on Bankruptcy* ¶ 522.05[1] at 522-31  (Alan N.

Resnick & Henry J. Sommer eds., 16th ed. 2013).

The information a debtor supplies on Schedule C is critical because it allows "parties in

interest to evaluate the propriety of the debtor's claim of exemptions."  *Id.*  A debtor must

therefore provide "sufficient detail to put the trustee on notice of questionable assertions."  *Payne*

*v. Wood*, 775 F.2d 202, 206 (7th Cir. 1985); *In re Lekas*, 299 B.R. 597, 600 (Bankr. D. Ariz.

2003); *In re Rosenzweig*, 245 B.R. 836, 840 (Bankr. N.D. Ill. 2000); *Doyle*, 209 B.R. at 901; 1

-23-

Ginsberg & Martin, *supra*, § 6.01[F] at 6-32. If a debtor fails to provide enough detail, he is deemed not to have claimed the exemption. *In re Bell*, 179 B.R. 129, 130 n.1 (Bankr. E.D. Wis. 1995); *In re Ogden*, 114 B.R. 730, 731 (Bankr. D. Colo. 1989) (concluding that insufficiently specific exemption claims "have no legal effect").

Bauman did not claim the federal retirement fund exemption because he did not give notice on his Schedule C that he was claiming it. Bauman correctly checked the box at the top of his Schedule C indicating that he was entitled to exempt the property listed in section 522(b)(3). (B. Ex. 1 at 12). But in the body of his Schedule C under the column requiring him to "specify [the] law providing [the] exemption," Bauman specified only "735 ILCS 5/12-1006," the Illinois state exemption, for the Bauman Venture Plan. (*Id.*). He did not specify 11 U.S.C. § 522(b)(3)(C).

A debtor's failure to specify the statutory basis for a claim of exemption prevents the trustee and creditors from considering the legal sufficiency of the claim. *Doyle*, 209 B.R. at 905. Parties in interest should not "be forced to guess what . . . statute(s) . . . [d]ebtors might claim exemption under." *In re Dickson*, 114 B.R. 740, 742 (Bankr. N.D. Okla. 1990). A debtor who fails to provide the legal basis of his claim of exemption therefore fails to claim the exemption. *In re Soto*, No. 13-02084 ESL, 2013 WL 3779382, at *6 (Bankr. D.P.R. July 18, 2013) (concluding that "[a] debtor's claim of exemption without citing the specific statute serving as the basis for the exemption . . . is improper and insufficient"); *see, e.g., In re Dzielak*, 435 B.R. 538, 547 n.3 (Bankr. N.D. Ill. 2010) (restricting exemption analysis to the Illinois retirement fund exemption because the debtor did not claim the exemption under section 522(b)(3)(C)).

Because Bauman did not specify that the Bauman Venture Plan's assets were exempt under section 522(b)(3)(C), he gave no notice that he intended to rely on the federal exemption as

-24-

well as the Illinois exemption, and he therefore did not claim the federal exemption.

Bauman suggests that checking the section 522(b)(3) box at the top of Schedule C was enough to claim the federal retirement fund exemption. (D. Proposed Findings at 1, 15). It was not. A debtor must not only check the box, he must complete the body of Schedule C by specifying the applicable law that exempts the particular property at issue. Checking the box alone at most selects one set of exemptions (section 522(b)(3)) over another (section 522(b)(2)). Checking the box for section 522(b)(3) might arguably *imply* the invocation of the federal retirement fund exemption in section 522(b)(3)(C). But exemption by implication is not enough. *In re Wisdom*, 478 B.R. 394, 399 (Bankr. D. Idaho 2012), *aff'd*, 490 B.R. 412 (D. Idaho 2013).

Claiming the section 522(b)(3)(C) exemption on his Schedule C would not have been enough in any event. Had Bauman claimed the exemption, he would still have had the burden under section 522(b)(4) to show he was entitled to the exemption. Section 522(b)(4)(A) of the Code provides that for purposes of section 522(b)(3)(C), retirement funds in a fund "that has received a favorable determination under section 7805" of the IRC in effect on the petition date are presumed exempt. 11 U.S.C. § 522(B)(4)(A). In the absence of such a determination, section 522(b)(4)(B) gives a debtor claiming a section 522(b)(3)(C) exemption the burden to demonstrate that

> (i) no prior determination to the contrary has been made by a court or the Internal Revenue Service; and
>
> (ii) (I) the retirement fund is in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986; or
>
> (II) the retirement fund fails to be in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986 and the debtor is not materially responsible for that failure.

-25-

11 U.S.C. § 522(b)(4)(B).[14/]

Bauman did not establish that the Bauman Venture Plan is presumed exempt under section 522(b)(4)(A). No evidence was offered that the Bauman Venture Plan had received a favorable IRS determination in effect on the petition date, as section 522(b)(4)(A) requires. The letter dated January 31, 2011, from the IRS to Pension Administrators merely found "acceptable" the form of a "volume submitter defined benefit plan." (B. Ex. 3 at 102). The letter specifically said that it was "not a ruling or determination as to whether an employer's plan qualifies under Code section 401(a)." (*Id.*) "The terms of the plan," the letter said, "must be followed in operation." (*Id.*). A letter of this kind, addressing only "form" and not "operation," does not raise the presumption under section 522(b)(4)(A). *Agin v. Daniels (In re Daniels)*, 452 B.R. 335, 347 (Bankr. D. Mass. 2011) (reaching this conclusion about an identical IRS letter), *aff'd on other grounds*, 482 B.R. 1 (D. Mass. 2012), *aff'd sub nom. Daniels v. Agin*, 736 F.3d 70 (1st Cir. 2013).[15/]

Because the evidence did not establish that the funds in the Bauman Venture Plan were presumed exempt under section 522(b)(4)(A), Bauman had to prove the elements of section

---

[14/]    This statutory allocation of the burden of proof to the debtor controls over the contrary allocation in Rule 4003(c), Fed. R. Bankr. P. 4003(c), which ordinarily gives the burden of proof to a party objecting to a debtor's claim of exemption. *See Zedan v. Habash*, 529 F.3d 398, 406 (7th Cir. 2008) (noting that a Code provision governs over a conflicting Rule).

[15/]    Even if the letter had addressed both plan form and operation, no evidence identified the plan discussed in the letter with Bauman Venture, neither the letter itself nor any testimony. The Bauman Venture Plan also consisted of more than just a volume submitter plan; it included an adoption agreement and trust document, neither of which the IRS letter mentioned. Finally, the IRS letter did not discuss the status, tax-exempt or otherwise, of any plan "as of the date of the filing of the petition." 11 U.S.C. § 522(b)(4)(A). The plan discussed in the letter was submitted on October 19, 2010, and the letter is dated January 31, 2011. (B. Ex. 3 at 102). Bauman did not file his petition until August 8, 2011.

522(b)(4)(B). He did not. There was no evidence that the IRS (or a court) had not previously

determined the Bauman Venture Plan was not tax-exempt.[16] *See* 11 U.S.C. § 522(b)(4)(B)(i).

Gilfand testified that he never received such a communication from the IRS (Tr. at 198), but a

determination would have been sent to Bauman Venture as plan sponsor, or perhaps Pension

Administrators. There was also no evidence that the Bauman Venture Plan substantially

complied with the requirements of the IRC, *see* 11 U.S.C. § 522(b)(4)(B)(ii)(I) – apart from

Ronczkowski's testimony, and his bald conclusion was unconvincing. (*See* Tr. at 174-75).

Because there was no evidence of compliance, there had to be evidence that Bauman was not

materially responsible for the Bauman Venture Plan's lack of compliance. *See* 11 U.S.C. §

522(b)(4)(B)(ii)(II). There was none.

 In short, Bauman failed to claim the federal retirement fund exemption in section

522(b)(3)(C). But even if he had claimed it, he failed to meet his burden of showing either that

the Bauman Venture Plan's assets are presumed exempt under section 522(b)(4)(A) or that they

are in fact exempt under section 522(b)(4)(B).

### 3. The Section 12-1006 Exemption

 That leaves Bauman's claim of the Illinois retirement fund exemption in section 12-1006

of the Illinois Code of Civil Procedure. Bauman adequately claimed the Illinois exemption on

his Schedule C. BankFinancial therefore bore the burden – both the initial burden of production

and the ultimate burden of proof, *In re Arnold*, No. 10-70126, 2010 WL 1416031, at *1 (Bankr.

C.D. Ill. Mar. 31, 2010) – of demonstrating by a preponderance of the evidence that Bauman's

interest in the assets of Bauman Venture Plan is not exempt under section 12-1006. Fed. R.

---

[16] The wording of section 522(b)(4)(B)(i) makes the triple negative unavoidable.

Bankr. P. 4003(c); *see In re Ritter*, 190 B.R. 323, 326 (Bankr. N.D. Ill. 1995) (describing burden

or proof as "preponderance of the evidence").  BankFinancial met that burden.[17]

  Section 12-1006 provides in part:

> A debtor's interest in or right, whether vested or not, to the assets
> held in . . . a retirement plan is exempt from judgment, attachment,
> execution, distress for rent, and seizure for the satisfaction of debts
> if the plan (i) is intended in good faith to qualify as a retirement
> plan under applicable provisions of the Internal Revenue Code of
> 1986, as now or hereafter amended, or (ii) is a public employee
> pension plan created under the Illinois Pension Code, as now or
> hereafter amended.

735 ILCS 5/12-1006(a) (2010).  The phrase "good faith intent to comply with the IRC" is not

defined in the statute, and decisions on the phrase are few.  Nevertheless, case law sets out

several principles useful in analyzing a section 12-1006 claim of exemption.

  • First, it is not enough simply that the debtor intended in good faith to use the funds in

question for retirement.  *In re Ellis*, 274 B.R. 782, 788 (Bankr. S.D. Ill. 2002).  Although the

statute is "broad and all inclusive," *Auto Owners Ins. v. Berkshire*, 225 Ill.App.3d 695, 698, 588

N.E.2d 1230, 1232 (2d Dist. 1992), it does not "protect whatever a debtor unilaterally chooses to

claim as intended for retirement purposes," *Ellis*, 274 B.R. at 788.  There must instead be a good

---

[17]  When this dispute first arose, BankFinancial objected to the exemption on the
grounds that ERISA preempts section 12-1006 and section 12-1006(c) violates the Supremacy
Clause.  (*See* B. Obj. ¶¶ 7-16).  After it became clear that Bauman could not enforce the Bauman
Venture Plan's anti-alienation provision under ERISA, BankFinancial abandoned the preemption
argument.  (*See* B. Proposed Findings at 25 n.10).  BankFinancial also abandoned its Supremacy
Clause argument in favor of its position that the funds in the Bauman Venture Plan are simply
not exempt under section 12-1006.  (*See id.* at 22 n.9).  The preemption and Supremacy Clause
arguments therefore need not be addressed.  *See In re Jokiel*, 453 B.R. 743, 752 n.8 (Bankr. N.D.
Ill. 2011) (declining to consider ERISA preemption argument because the debtor's interest in the
pension plan "would neither be excluded nor exempted from the bankruptcy estate under ERISA
. . . or 735 ILCS 5/12-1006").

faith intent for the retirement plan to qualify under the IRC. *Id.*; *see also Jokiel*, 453 B.R. at 747;

*In re Wolf*, No. 10 B 41582, 2011 WL 1298277, at *2 (Bankr. N.D. Ill. Mar. 31, 2011); *Ritter*,

190 B.R. at 326; *Templeton*, 146 B.R. at 762 (declaring that "[i]t is the intent for such retirement

plans to qualify under the Internal Revenue Code in good faith that is critical").

• Second, it is not enough that the debtor intended in good faith for the plan to qualify as a

retirement plan under the IRC when the plan was established. The debtor must have had that

good faith intent throughout the plan's existence. *Ritter*, 190 B.R. at 326 (stating that the plan

must be both "established" and "maintained" in good faith to qualify as a retirement plan under

the IRC). Requiring the debtor's good faith intent to extend beyond the plan's establishment to

its operation is consistent with the requirement that a retirement plan comply with the IRC in

both form and operation to receive favorable tax treatment. 26 U.S.C. § 401(a); *See Ludden*, 68

T.C. at 831 (stating that "[i]n order for a plan to be considered qualified, not only its terms but

also its operations must meet the statutory requirements").

• Third, good faith under section 12-1006 is necessarily a fact-specific determination to

be made on a case-by-case basis. Illinois courts have always considered "good faith" an elusive

concept. *Gass v. Anna Hosp. Corp.* 392 Ill. App. 3d 179, 184, 911 N.E.2d 1084, 1089 (5th Dist.

2009) (noting that "'[g]ood faith is hardly capable of an exact definition'" (internal quotation

omitted)); *see, e.g., McConnel v. Street*, 17 Ill. 253, 254 (1855) (defining "good faith" as the

opposite of "bad faith"). Whether someone has acted in "good faith" thus depends on the context

and circumstances of each case. *Scharf v. Waters*, 328 Ill. App. 525, 544, 66 N.E.2d 499, 507

(1st Dist. 1946) (stating that "good faith . . . depends on many circumstances and conditions");

*see also In re Canniff*, 498 B.R. 213, 217 (Bankr. S.D. Ind. 2013) (observing that "[t]he term

good faith . . . usually means something different depending upon the context in which it used").

-29-

The context here alters the "good faith" analysis. A large corporate employer with hundreds of employees establishes and maintains the plan itself; the employer is in charge. An individual employee does little more than agree to participate in the plan, render services to the employer, and then accept the benefits when he retires. When the employee later tries to shield his retirement funds from creditors under section 12-1006 and it turns out the plan lost its qualification under the IRC because of some operational defect, the participant can still claim the exemption because he relied on his employer. *See Jokiel*, 453 B.R. at 749 (noting that the statute is meant in part to protect the employee who "thought he was investing in a qualified plan because of representations made to him").

The Bauman Venture Plan is not the pension plan of a large corporate employer, and Bauman is not one of hundreds of employees who signed a form agreeing to participate in the plan. Bauman is the sole owner and operator of the plan sponsor, Bauman Venture, as well as the trustee of the plan's trust. The Bauman Venture Plan came about only because Bauman himself caused it to be created. Bauman is in charge, entrusted with the Plan's assets. Because this case is not the ordinary one involving an employee of a large business, the "good faith" analysis changes accordingly. For someone like Bauman to satisfy the "good faith" requirement of section 12-1006, substantially more can be expected.

Bauman did not do what was expected of him. Again, the problem lies not in the establishment of Bauman Venture Plan. At least on the date it was established, the Plan was intended in good faith to qualify as a retirement plan under the IRC. BankFinancial concedes that the form of the Bauman Venture Plan complies with the IRC. (*See* B. Proposed Findings at 28). As BankFinancial correctly argues, the problem lies instead with the Plan's operation. To receive favorable tax treatment, it bears repeating, a plan must be operated in accordance with

-30-

IRC, *see* 26 U.S.C. § 401(a); *Ludden*, 68 T.C. at 831, and with its own terms, *see In re Bennett*, No. 12-60642-tmr7, 2013 WL 4716180, at *7 (Bankr. D. Or. Sept. 3, 2013) (noting that "operational errors or breaches of the plan itself can justify disqualification"). The evidence showed plainly that the Bauman Venture Plan was not operated in compliance with the IRC or the Plan's terms.

The Plan's operation was non-compliant, first, on the contribution end. The underlying intent of the Plan was for Bauman Venture to make regular contributions. (*See* B. Ex. 3 at 47). The contributions had to be based on the defined benefit to which Bauman was entitled. That benefit was based on Bauman's W-2 income using the Highest Five of the Last Ten Years Formula. Contributions could not be greater than the amount necessary to pay the defined benefit under the Plan, nor could they exceed the limits in section 415(b)(1) of the IRC.

Bauman Venture made no contributions to the Bauman Venture Plan, let alone regular ones. *Id.* Only three contributions were made over the Plan's life. The first was the Austin Bond proceeds. Bauman made that contribution to the Plan directly – in violation of the Plan's prohibition on employee contributions. (*See* B. Ex. 3 at 47). The second came from the Bauman Mortgage Plan when the two Plans merged, a transaction that was not documented until months later. The third came from the sale of Bauman's residence. Although Bauman tried to disguise the origin of the funds by making a phony capital contribution to Bauman Venture – phony because Bauman Venture was no longer operating and had no need of capital – the contribution effectively came from Bauman, again in violation of the Plan.

Not only did these contributions come largely from Bauman himself, but they were not based on the defined benefit to which Bauman was entitled. Contributions to the Plan depended on the benefit, and the benefit depended on Bauman's W-2 income. Bauman had no W-2 income

-31-

from Bauman Venture during the relevant period (or, for matter, any W-2 income at any point).

Under the Highest Five of the Last Ten Years Formula Bauman was therefore entitled to no

benefits. Because Bauman was entitled to no benefits, the contributions necessarily exceeded the

benefits. Because Bauman had no W-2 income, the contributions also necessarily exceeded the

limits in section 415(b)(1) of the IRC. *See In re Handel*, 301 B.R. 421, 432 (Bankr. S.D.N.Y.

2003) (finding excessive contributions disqualified a pension plan from favorable tax treatment).

The Plan's operation was equally non-compliant on the distribution end. Like

contributions, distributions had to be based on the defined benefit to which Bauman was entitled.

The distributions should also have been relatively similar, increasing annually by a small

percentage – perhaps 5%, Ronczkowski said. (Tr. at 119, 125-56). Bauman received three

distributions that were not relatively similar, and the distributions did not increase annually by a

standard amount. The second distribution was smaller than the first, and the third was more than

5% larger than the second, differences that went unexplained. (*See* Tr. at 154-55). But just as

the contributions to the Plan disqualified the Plan from favorable tax treatment, so did the

distributions from it. Distributions depended on contributions. Because Bauman had no W-2

income, he was not entitled to benefits. No distributions could have been made to him from the

Bauman Venture Plan and still have the Plan comply with the IRC.

Rather than do what was necessary for favorable tax treatment under the IRC, Bauman

treated the Plan as little better than a fancy bank account. Ignoring the Plan documents and the

law, Bauman added money to the Plan – lots of it – whenever he felt like it. Bauman then

withdrew money from the Plan after his retirement, although he was not entitled to any

distributions, in amounts that made no sense. The contributions as well as the distributions failed

to comply with the IRC and disqualified the Plan from favorable tax treatment. The Bauman

Venture Plan was a mere facade, a pension plan in name only.

Bauman operated the Bauman Venture Plan this way, the evidence suggested, not from any wrongful intent, but because he knew no better. But he knew no better because he never tried to know better. Although Bauman was a sophisticated businessman with enough financial acumen to run his own lending and consulting businesses and have interests in a variety of companies, he made no effort to understand the Plan. He conceded that he never read the Bauman Mortgage Plan or the Bauman Venture Plan, neither the original Plans when they were established nor any of their subsequent iterations. (Tr. at 38-39). He admitted he knew nothing about pension plans. (*Id.* at 42). Bauman was so removed from the operation of the Plans that he allowed Gilfand to sign Bauman Venture Plan tax returns as well as the board resolution authorizing the merger of the two Plans. (Tr. at 54, 58; B. Ex. 15 at 2170). Although Bauman had regular meetings with Gilfand about financial matters, he acknowledged he never understood what went on at those meetings because, he said, he "never paid much attention." (*Id.* at 275).

Inattention will not do. When a debtor is not only a pension plan participant but also the owner of the plan sponsor and the trustee of the trust, he must *try* to become familiar with the plan's terms and the IRC's requirements and *try* to comply with them. "Good faith" in other contexts requires at least that much from employers. *Cf. Reich v. Southern New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997) (employer claiming good faith intent to comply with FLSA must show "at least an honest intention to ascertain what the Act requires and to comply with it" (internal quotation omitted)); *Thorson v. Geminin, Inc.*, 96 F. Supp. 2d 882, 891 (N.D. Iowa 1999) (employer claiming good faith intent to comply with FMLA must "take active steps to ascertain the dictates of the law and then move to comply with them"); *see also EEOC v. First Citizens Bank of Billings*, 758 F.2d 397, 403 (9th Cir. 1985) (corporate officers' "bald

-33-

assertions . . . that they thought they were in compliance" did not show good faith attempt to

comply with Equal Pay Act). Bauman could not remain blissfully ignorant of the Plan and the

law, operate the Plan with complete indifference to the IRC and the Plan's own terms, and then

hope to shield $1.2 million from creditors.

 Because the evidence demonstrated clearly that Bauman lacked a good faith intent for the

Bauman Venture Plan to qualify as a retirement plan under the IRC, the assets of the Plan are not

exempt under section 12-1006.

 In support of his exemption claim, Bauman makes two arguments. First, he insists it was

enough that he had a good faith intent to comply with the IRC when the Bauman Venture Plan

was established. (D. Proposed Findings at 16). What happened during the thirty years of

operation that followed, he maintains, is irrelevant.

 Not so. Section 12-1006 calls for a good faith intent to "qualify as a retirement plan"

under the IRC. 735 ILCS 5/12-1006 (2010). To qualify, a plan must comply with the IRC not

only at its establishment but in its operation. 26 U.S.C. § 401(a); *Bennett*, 2013 WL 4716180, at

*7; *Ludden*, 68 T.C. at 831. In arguing otherwise, Bauman seizes on the statement in *Ritter* that

"[t]he Trustee has critically failed to offer any evidence to show that [the plan was] not

established in conformity with . . . the Internal Revenue Code." *Ritter*, 190 B.R. at 326. Bauman

ignores the later finding in *Ritter* that the trustee had failed to offer evidence that the IRA and

Keogh accounts at issue "were not intended to be established *or maintained* by the Debtor in

'good faith' to qualify as retirement plans under the applicable provisions of the Internal Revenue

Code." *Id.* (emphasis added). Nothing in the language of section 12-1006 supports Bauman's

distinction between establishment and operation. It would make little sense to provide an

exemption for retirement funds in a pension plan that qualified as such only in form.

Second, Bauman argues that he relied on professionals – on Gilfand, his accountant, and on Ronczkowski at Pension Administrators – to ensure compliance with the IRC. That reliance, Bauman contends, demonstrates his good faith intent. (D. Proposed Findings at 16-17).

Bauman cites no authority under section 12-1006 for this contention, and there is none. In other contexts, Illinois courts have held that reliance on professionals can sometimes constitute good faith. *See, e.g., IOS Capital, Inc. v. Phoenix Printing, Inc.*, 348 Ill. App. 3d 366, 375, 808 N.E.2d 606, 614 (4th Dist. 2004) (discussing liability of corporate officers and directors for actions taken on behalf of corporation). A person relies in good faith on professional advice when he has no reason to believe his reliance is unwarranted. *Id.; see also Jewish Hosp. of St. Louis, Mo. v. Boatmen's Nat'l Bank of Belleville,* 261 Ill. App. 3d 750, 768, 633 N.E.2d 1267, 1281 (5th Dist. 1994) (noting that bank serving as executor could rely on attorney's advice "unless [it] knowingly chose incompetent counsel or had some reason to know that the advice given was not sound").

Blind reliance, however, is not enough, *IOS Capital*, 348 Ill. App. 3d at 375, 808 N.E.2d at 614 (noting that a corporate officer or director "may not blindly accept counsel's advice to avoid liability"), and Bauman's reliance was nothing if not blind. Again, Bauman made no effort whatever to determine what the terms of the Bauman Venture Plan were or what the IRC required, nor did he educate himself about his duties as owner of the plan sponsor and trustee of the trust. He could fairly have been expected to do both. Yet he admitted simply doing as he was told, never concerning himself with the reasons why. (Tr. at 275).[18] Bauman cannot now

---

[18]    The evidence also showed that Bauman did not always rely on the advice of his professionals. He contributed the proceeds of the Austin Bond liquidation to the Plan without consulting Gilfand, Ronczkowski, or any other professional. (Tr. at 64-65, 205-06, 227, 240-41). He may well have contributed the funds from the Bauman Mortgage Plan without consulting

absolve himself of the Plan's failure to operate in compliance with its terms and the IRC and

shield the Plan's assets from his creditors by assigning all responsibility to Gilfand and

Ronczkowski.  He had responsibilities of his own.

## IV.  Conclusion

For these reasons, the objection of BankFinancial, FSB to debtor Daniel Bauman's claim

of exemption in the assets of the Bauman Venture Corporation Pension Plan and Trust is

sustained.  The claim of exemption is disallowed.  A separate order will be entered consistent

with this opinion.


Dated: March 4, 2014

A. Benjamin Goldgar
United States Bankruptcy Judge

---

anyone, since the transaction was only documented months later.  Bauman admitted that he never
consulted directly with Ronczkowski.  (*Id.* at 42).